Chad Conelly, SBN 022394
**MOLEVER CONELLY PLLC**
Indian Bend Corporate Centre
8161 E. Indian Bend Road, Suite 103
Scottsdale, Arizona 85250
Telephone: 480-268-2658
cc@arizonalegal.com
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Corinne Breshears,<br><br>Plaintiff,<br><br>v.<br><br>Yuma Regional Medical Center,<br><br>Defendant. | No.:<br><br>**COMPLAINT** |

Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.  Plaintiff Corinne Breshears is seeking judgment, relief and damages under the Fair Labor Standards Act, as amended by the Patient Protection and Affordable Care Act, based on the unlawful conduct of her former employer, Yuma Regional Medical Center ("YRMC"), where she worked as a nurse.

2.  After Ms. Breshears gave birth to twins, YRMC violated the FLSA's provisions protecting nursing mothers by failing to provide her reasonable break time to express breast milk and failing to provide her a place that was shielded from view and free from intrusion from coworkers to express breast milk.

1

3.      YRMC also violated the FLSA's provisions protecting nursing mothers by retaliating against her after she complained about YRMC's failure to provide her adequate breaks to express milk, failure to provide a proper location to do so, and the harassment and retaliation to which she was subjected.

**PARTIES, VENUE, AND JURISDICTION**

4.      Corinne Breshears is a resident of San Diego, California.

5.      Ms. Breshears was a resident of Yuma County, Arizona during the events alleged in this Complaint.

6.      Defendant YRMC is an Arizona nonprofit corporation that does business in Yuma County, Arizona.

7.      The events at issue in this case occurred in Yuma County, Arizona.

8.      This Court has subject matter jurisdiction over this dispute.

9.      This Court has jurisdiction over Plaintiff's claims under 29 U.S.C. § 207 (Fair Labor Standards Act) and 28 U.S.C. § 1331 (federal question).

10.     This Court has personal jurisdiction over the parties.

11.     Venue in this Court is proper.

**GENERAL ALLEGATIONS**

12.     Ms. Breshears is a registered nurse and she was a registered nurse during the events alleged in this Complaint.

13.     YMRC is the largest hospital in Yuma, Arizona, with over 400 beds, over 2,000 employees and over 400 medical practitioners.

14.     Ms. Breshears started working at YRMC in Yuma, Arizona in or around October 2016.

15.     Ms. Breshears's first position at YRMC was as a full-time, non-exempt registered nurse working on a telemetry floor of the hospital.

16.     In or around February 2017, Ms. Breshears became a full-time core permanent employee in the women's and children's department.

2

17. In that position, Ms. Breshears cared for women and pediatric patients, including sick babies and newborn postpartum mother-baby pairs.

18. In that position, Ms. Breshears also floated to other floors such as the NICU and the postpartum floor, and to other inpatient units at YRMC on the night shift.

19. Ms. Breshears became pregnant for the second time in July 2017.

20. Ms. Breshears went on leave from January 3 to April 11, 2018 for her pregnancy and newborn care.

21. While on leave, on or about January 18, 2018, Ms. Breshears emailed her supervisor, Tari Zivira, to request accommodations to pump breast milk at work.

22. Ms. Zivira responded the hospital would will try to accommodate her need to pump at work but the unit's needs would take priority, there would be a time limit set, and Ms. Breshears would not be allowed to leave to pump until all patient needs were met and no work remained for a coworker while she was pumping.

23. Ms. Breshears did not agree with Ms. Zivira's proposal - Ms. Breshears thought it was unrealistic and unlawful.

24. Ms. Breshears requested coverage by a nurse so that she'd have time to pump at work, but Ms. Zivira said the hospital would not provide coverage – she said there would be no nurses available to cover patients when she needed to pump.

25. Ms. Breshears gave birth to twin girls on March 1, 2018.

26. Ms. Breshears's doctor cleared her to return to work on April 8, 2018.

27. Ms. Breshears went to YRMC on or about April 11, 2018 to pick up her schedule.

28. Ms. Breshears was called into a meeting with charge nurses.

29. Ms. Breshears was given a memo about her return to work and the limitations YRMC was placing on her right and ability to pump milk at work, when she would be allowed to do so, how often, and for how long. (That document is referred to in this Complaint as the "Breshears Pumping and Break Limitation Rules"). That document instructed Ms. Breshears, in part:

3

> Further, we will allow you to take two 20 minute breaks from your work duties, instead of 15 minutes, with the thought that would allow you five minutes for set up and take down and a full 15 minute pump cycle.
>
> […] We do ask that you come to work prepared not to pump in the first 4 hours of the shift. When you do need to plan a break to pump, all needs must be met for your patients, and you will have coordinated with the RC on shift to ensure the safety of the patients on the unit.

30. Ms. Breshears was told she had to follow the Breshears Pumping and Break Limitation Rules.

31. Ms. Breshears resumed her nursing duties with patients on or about April 19, 2018.

32. When Ms. Breshears resumed her nursing duties at YRMC, she was six weeks postpartum nursing twins and, therefore, needed to pump breast milk at work.

33. Between the date Ms. Breshears resumed her nursing duties at YRMC until around September 21, 2018, YRMC refused to allow Ms. Breshears reasonable break time to express breast milk during her shifts.

34. During that time, Ms. Breshears was working up to 13 hours per shift.

35. During that time, Ms. Breshears's twins were nursing every three hours night and day without supplementing any formula, feeding exclusively on breast milk.

36. A lactation specialist told Ms. Breshears that breast-feeding mothers should pump as often as they nurse, so she should have been pumping every three hours, which would have been up to four times each shift.

37. Under the Breshears Pumping and Break Limitation Rules, Ms. Breshears was prohibited from pumping breast milk at the frequency she needed – she had to go much longer than three hours without pumping.

38. Because of the extreme limitations YRMC placed on Ms. Breshears under the Breshears Pumping and Break Limitation Rules, Ms. Breshears suffered significant pain from engorgement, inability to focus due to pain, and inability to pump enough milk

for her twins.

39. Often Ms. Breshears felt the need to pump at work and she would experience a painful letdown reflex because her breasts were so full of milk, yet she was not permitted by YRMC to pump when needed.

40. Occasionally other nurses agreed to help Ms. Breshears when she brought up her need to pump and would cover her patient briefly, but that rarely occurred and even when it did, she was given conditions.

41. Some charge nurses were strict and would not allow Ms. Breshears a break to pump even if it had been four hours.

42. Ms. Breshears would often have to delay pumping by many hours.

43. On some days, she was only permitted one or two breaks per 13-hour shift to pump, giving her only about 15-20 total minutes per shift to pump, which was not enough time to express enough milk for her twins.

44. Pumping for twins generally requires more time than a mother with a single child because it is twice as much milk and the milk is not expressed as fast.

45. Fifteen minutes was not enough time for Ms. Breshears to setup, pump enough milk, and clean up, so she always needed more than 15 minutes for the process, despite her best efforts to finish within that time.

46. Because Ms. Breshears used her limited break time to pump, she had little to no other break time to use the restroom or for any other personal time such and to eat during the day.

47. The hospital had several designated "lactation stations" throughout the hospital but Ms. Breshears was not permitted to use those – she was told to use a patient room in her unit due to the lack of available staff on her night shift.

48. That room was not shielded from view - it had a window that looked out into the unit.

49. Ms. Breshears complained about the open window and was told to tape up a blanket, which often was not available after she had previously taped it up because

5

someone, possibly cleaning staff, had removed it.

50. Ms. Breshears was required to keep her phone and tracker with her at all times in the hospital even when she was going on a break to pump.

51. The charge nurses and Ms. Breshears's supervisor, Tari Zivira, told her that she needed to use a patient room in the unit to pump because they needed to track her location with the tracker she wore so they could find her and get her quickly if she was needed.

52. Several times after Ms. Breshears had clocked out for a break to pump, when she was in a patient room pumping, she was interrupted during her break and required to work during her break including to take calls from doctors.

53. Ms. Breshears was not completely relieved from duty for all the breaks she took to pump – she was told the hospital could not relieve her from duty, even when she needed to pump and even if she was on a break for which she clocked out, because of the limited number of nurses on the night shift in the unit.

54. Ms. Breshears not paid for all the time she was on duty.

55. Due to the intense pressure and limitations YRMC placed on Ms. Breshears, she had difficulty relaxing when she was pumping, which she found inhibited her milk production and milk expression because she was worried that her charge nurse would disapprove, discipline her or retaliate against her.

56. Some charging nurses belittled Ms. Breshears at work and told her that breast milk is "gross."

57. Some charging nurses commented to Ms. Breshears that she should not be feeding her children breast milk once they had teeth.

58. One day when Ms. Breshears asked a charging nurse for a break to pump, the nurse said, "How would you like it if I took a smoke break two hours after I arrived to work?"

59. Ms. Breshears would often have to spend five to ten minutes persuading the charge nurse to let her take a break to pump.

6

60. Due to the intense pressure and limitations YRMC placed on Ms. Breshears concerning pumping at work, Ms. Breshears would often cry at work from the pain, shame, and anxiety or go into the bathroom and hand express some milk into the sink to relieve some of the pressure.

61. Due to the intense pressure and limitations YRMC placed on Ms. Breshears concerning pumping at work, her milk production decreased after about one week at work from approximately 42 ounces per shift to 24 ounces per shift, and less over time.

62. Due to the intense pressure and limitations YRMC placed on Ms. Breshears concerning pumping at work, Ms. Breshears was rarely able to produce enough milk for her twins.

63. On or about June 5, 2018, Ms. Breshears's OBGYN prescribed her medication to increase her milk supply since it was dwindling due to her not pumping enough at work and the trouble Ms. Breshears was having producing enough milk.

64. Ms. Breshears emailed her supervisor, Tari Zivira, to report the harassment she was experiencing from a charging nurse concerning her need to pump at work.

65. In July 2018, a charge nurse told Ms. Breshears that, during a meeting of the charge nurses (which Ms. Breshears did not attend), the nurses discussed that Ms. Breshears was not following the Breshears Pumping and Break Limitation Rules, and she warned Ms. Breshears that she should follow them.

66. On or about August 13, 2018, Ms. Breshears met with her supervisor, Ms. Zivira.

67. Ms. Zivira gave Ms. Breshears a formal written corrective action dated July 30, 2018 (the "July 2018 Written Discipline").

68. The July 2018 Written Discipline included many inaccuracies.

69. Some of the events referenced in the July 2018 Written Discipline concerned events that occurred when Ms. Breshears was on a break to pump, and it states the discipline was because she left the floor for 30 minutes (when her time was limited to 20 mins under the Breshears Pumping and Break Limitation Rules).

4833-1808-7609, v. 5

70. The July 2018 Written Discipline alleged patient care was delayed because she had to take breaks to pump.

71. Ms. Breshears explained to Ms. Zivira gave that patient care was not being delayed because of her pumping; rather, it had been delayed because Ms. Zivira had not provided a nurse or required a charge nurse to care for patients when Ms. Breshears took an approved break.

72. Ms. Breshears explained to Ms. Zivira that, based on the July 2018 Written Discipline, it seemed YRMC was prohibiting her from taking any breaks whatsoever to pump because she was ultimately being disciplined for taking breaks to pump.

73. Ms. Zivira told Ms. Breshears, "Corinne prioritizes Corinne", implying to Ms. Breshears that her need to pump was a problem and she could not care for the patients since she needed to pump.

74. Ms. Breshears again asked Ms. Zivira for a nurse to cover her while she was on breaks to pump, and Ms. Zivira said it was not possible.

75. Ms. Breshears felt there was no resolution of the situation and problems from her meeting with Ms. Zivira and Ms. Breshears felt her job was in jeopardy because of her need and right to take breaks to pump and care for her twins.

76. Immediately after her meeting with Ms. Zivira, Ms. Breshears went to YRMC Human Resources.

77. Ms. Breshears spoke with Laura Witowski in Human Resources about the situation and her complaints.

78. Ms. Witowski told Ms. Breshears her only option was to provide a written rebuttal, turned in within two weeks.

79. Ms. Breshears was given no other information or options about being able to continue pumping at work.

80. YRMC made it clear that, despite Ms. Breshears's complaints, she still had to follow the Breshears Pumping and Break Limitation Rules.

81. After meeting with Ms. Witowski, Ms. Breshears contacted the United States Department of Labor to report the problems she was experiencing at YRMC about restrictions on pumping.

82. On or about August 15, 2018, Ms. Breshears informed Laura Witowski that she had submitted a complaint with the United States Department of Labor about the restrictions on pumping.

83. On or about September 16, 2018, Ms. Breshears received separate emails from Ms. Zivira and Ms. Witowski that Ms. Breshears be allowed to pump as needed as required by federal law.

84. Over approximately the next two weeks, she still was not permitted enough time to pump, and she was told it was because the charge nurses were still making her delay pumping because it was busy.

85. Ms. Breshears continued having to delay pumping by many hours, and she was bullied by coworkers that her breastmilk in the refrigerator was "disgusting."

86. Ms. Breshears reported to Ms. Witowski that, because of the continued problems including that she was threatened with a second writeup concerning an issue involving her break to pump, she was considering resigning her position and asked for a resignation form.

87. Because Ms. Breshears needed her job, and enjoyed the work except for the harassment, humiliation, and unlawful conduct she experienced due to her need to pump, Ms. Breshears chose not to resign and instead asked for a transfer.

88. On August 30, 2018, Ms. Breshears applied to work on a different floor, postpartum floor, JOB #2262BR RNII, a unit in which she was qualified to work because she was often floated there when her unit had enough nurses and the postpartum floor was short.

89. Ms. Breshears also regularly managed postpartum patients on her home floor because they were an overflow floor.

90. The manager of the unit to which Ms. Breshears applied was Ms. Zivira's supervisor.

91. Ms. Breshears spoke with Ms. Zivira about her desire for the transfer.

92. Ms. Breshears was not interviewed for the position.

93. Ms. Breshears was not granted the transfer.

94. Upon information and belief, sometime after Ms. Breshears complained about YRMC's improper actions, YRMC had an opening for a charge nurse on the night shift.

95. Upon information and belief, YRMC asked a nurse who was hired after Ms. Breshears with less experience than Ms. Breshears to train for the charge nurse position.

96. YRMC did not ask Ms. Breshears if she was interested in that charge nurse position.

97. Ms. Breshears was qualified to be a charge nurse on the night shift.

98. Upon information and belief, Ms. Breshears was more qualified for the charge nurse position than the nurse who YRMC ultimately chose for the position.

99. Had YRMC offered Ms. Breshears the position of charge nurse on the night shift, she would have accepted it.

100. Moving from the nursing position Ms. Breshears had to the position of charge nurse would have been a promotion and she would have earned more money.

101. Around September 6 to 12, 2018, Ms. Breshears spoke with representatives from the Department of Labor who interviewed her, and Ms. Breshears provided documents and information they requested for their investigation.

102. Upon information and belief, the Department of Labor contacted YRMC about Ms. Breshears's complaints.

103. On or about September 21, 2018, Ms. Breshears met with Scott Bernard from YRMC, Ms. Zivira, and a charge nurse.

4833-1808-7609, v. 5

104. During the meeting, Mr. Bernard asked Ms. Breshears if she was able to pump when needed at work, and Ms. Breshears said she could not.

105. Mr. Bernard told the charge nurse and Ms. Zivira that the law was clear on the issue and there was no situation in which they could keep Ms. Breshears from pumping if that is what she needed to do.

106. During that meeting, the charge nurse complained that Ms. Breshears had once left to pump when a patient was throwing up (which was untrue) and Mr. Bernard explained that, even if a patient has nausea and vomiting, Ms. Breshears could leave to pump.

107. In response, Ms. Zivira explained that the charge nurses could and would care for all Ms. Breshears's patients from then on when Ms. Breshears needed to take a break to pump.

108. During the meeting, Mr. Bernard said YRMC was rescinding the written discipline Ms. Breshears had received (*i.e.*, the July 2018 Written Discipline).

109. Fortunately, after the meeting Ms. Breshears had with Mr. Bernard, a charge nurse, and Ms. Zivira, Ms. Breshears was permitted adequate time for breaks to pump and she had no further problems with that issue, other than having a reduced milk supply.

110. The United States Department of Labor investigated Ms. Breshears's complaints and found: (a) YRMC violated Section 207(r) of the FLSA by failing to provide Ms. Breshears reasonable break time to express milk; (b) YRMC violated Section 207(r) of the FLSA by failing to provide Ms. Breshears an adequate place, other than a bathroom, shielded from view and free from intrusion to express milk; and (c) YRMC retailed against Ms. Breshears in violation of Section 215(a)(3) of the FLSA by issuing the July 2018 Written Discipline.

/ / /

/ / /

/ / /

4833-1808-7609, v. 5

# VIOLATION OF THE BREAK TIME FOR NURSING MOTHERS LAWS AND RETALIATION FOR TAKING PROTECTED ACTIVITY

111. Ms. Breshears realleges each allegation set forth in this Complaint and incorporates them here by reference.

112. Ms. Breshears is a non-exempt employee under section 7 of the FLSA and was a non-exempt employee under section 7 of the FLSA during the events alleged in this Complaint.

113. YRMC is an employer within the meaning of the FLSA.

114. YRMC has more than 50 employees and had more than 50 employees during the events alleged in this Complaint.

### Violation of the Fair Labor Standards Act
### 29 U.S.C. § 207(r)

115. Ms. Breshears realleges each allegation set forth in this Complaint and incorporates them here by reference.

116. The FLSA, as amended by the Patient Protection and Affordable Care Act, 29 U.S.C. § 207(r), requires an employer to provide a suitable location and break times for the purpose of expressing breast milk for one year after a child's birth each time an employee has need to express the milk. The location must be a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public.

117. YRMC failed to provide Ms. Breshears reasonable break times to express breast milk.

118. YRMC failed to provide Ms. Breshears a suitable location that was shielded from view and free from intrusion from coworkers to express breast milk.

119. Because of YRMC's violations of 29 U.S.C. § 207(r), Ms. Breshears was damaged.

120. Because of YRMC's violations of 29 U.S.C. § 207(r), Ms. Breshears has suffered losses, including loss of earnings.

4833-1808-7609, v. 5

121. Because of YRMC's violations of 29 U.S.C. § 207(r), Ms. Breshears suffered embarrassment, humiliation, pain, and anguish, and other incidental and consequential damages and expenses.

122. The conduct of YRMC in violation of 29 U.S.C. § 207(r) was outrageous and malicious, was intended to injure Ms. Breshears, and was done with reckless indifference to Ms. Breshears's protected civil rights, entitling Ms. Breshears to an award of punitive damages.

## Retaliation in Violation of the Fair Labor Standards Act
## 29 U.S.C. § 215(a)(3)

123. Ms. Breshears realleges each allegation set forth in this Complaint and incorporates them here by reference.

124. Ms. Breshears took protected activity which included, among other actions, reporting to YRMC its violations of the break time for nursing mothers laws and the harassment to which she was subjecting for needing to pump milk when at work, submitting a complaint to the Department of Labor, and informing YRMC that she had complained to the DOL.

125. Because of Mr. Ms. Breshears's protected activity, YRMC took negative employment actions against her, including issuing the July 2018 Written Discipline, refusing to approve the transfer she requested, and failing to consider or promote her for the night shift charge nurse position for which she was qualified.

126. YRMC's conduct constitutes unlawful retaliation under the FLSA.

127. Because of YRMC's retaliatory conduct, Ms. Breshears was damaged.

128. Because of YRMC's retaliatory conduct, Ms. Breshears has suffered losses, including loss of earnings.

129. Because of YRMC's retaliatory conduct, Ms. Breshears suffered embarrassment, humiliation, pain, and anguish, and other incidental and consequential damages and expenses.

4833-1808-7609, v. 5

130. The retaliatory conduct of YRMC was outrageous and malicious, was intended to injure Ms. Breshears, and was done with reckless indifference to Ms. Breshears's protected civil rights, entitling Ms. Breshears to an award of punitive damages.

## JURY DEMAND

131. Ms. Breshears requests trial by jury.

WHEREFORE, Ms. Breshears requests the Court enter judgment in her favor against YRMC:

A. For an award of Ms. Breshears's damages for loss of wages, benefits, and promotional opportunities, including an award of back pay for all lost salary and benefits and an additional amount as liquidated damages.

B. For an award of damages to compensate Ms. Breshears for the mental anguish, humiliation, embarrassment, pain and emotional injury she suffered.

C. For all other damages permissible under the FLSA.

D. For an award of punitive damages.

E. For an award of reasonable attorneys' fees and the costs of this action.

F. For pre-judgment and post-judgment interest on all amounts awarded.

G. For any other and further relief as this Court may deem just and proper.

DATED: April 10, 2020.

**MOLEVER CONELLY PLLC**

By: s/ Chad Conelly / 022394
Chad Conelly
Attorneys for Plaintiff